2026 IL App (1st) 231894-U

No. 1-23-1894

Order filed January 28, 2026

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 CR 4176 |
| | ) | |
| JASON VELEZ, | ) | Honorable |
| | ) | Diana L. Kenworthy, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Martin and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The judgment of the trial court, which found defendant guilty of aggravated domestic battery, aggravated kidnapping, and aggravated criminal sexual assault, is affirmed.

¶ 2   Defendant Jason Velez was found guilty of aggravated kidnapping, aggravated criminal sexual assault, and aggravated domestic battery. He now appeals, arguing that the trial court erred when it excluded a video of an allegedly consensual sexual encounter between defendant and the victim, K.T.

¶ 3      For the reasons that follow, we affirm the judgment of the trial court.[1]

¶ 4                                    I. BACKGROUND

¶ 5      On April 12, 2022, the State charged defendant with four counts of aggravated kidnapping, one count of aggravated criminal sexual assault, two counts of aggravated domestic battery, two counts of aggravated battery, and one count of unlawful restraint.

¶ 6                              A. The State's Case-in-Chief

¶ 7      Defendant's bench trial commenced with the testimony of K.T., who was 27 years old at the time of trial. K.T. met defendant at the end of 2021, and they began dating at the end of 2021 or the beginning of 2022. While they were dating, defendant lived in an apartment on the 3200 block of North Monticello in Chicago, Illinois with his mother, but defendant also frequently stayed with K.T. at her apartment on the 4800 block of West Henderson in Chicago, Illinois.

¶ 8      On March 10, 2022, defendant, who suspected K.T. of infidelity, called her a "cheating whore," after searching her phone. Defendant then took K.T.'s car, forcing K.T. to find another way to get to work. When K.T. returned home from work, defendant was in her apartment drinking. She told defendant to go home and that she did not want to see him again, but defendant refused to leave. Defendant returned K.T.'s car keys, and she left to do some errands. When she was finished, she went to her parents' home because she was scared to go home. She explained that defendant was hostile that day and he had struck her in the past, so she feared he would do so again.

_____

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 9    K.T. informed her parents of what had transpired, and together they accompanied K.T. back to her apartment. There they found defendant, who was still drinking. K.T.'s mother told defendant to leave, and he became hostile but eventually agreed to leave. Defendant later called K.T. multiple times and the two agreed to meet so defendant could recover some of his belongings from K.T.'s car.

¶ 10    K.T. and her parents called the police, but they did not arrive before defendant obtained his belongings and left. After the police arrived, they escorted K.T. to a friend's home because she was fearful that defendant would return that night. She brought her dog with her because she feared defendant might harm it. That night, defendant called K.T. more than 20 times, and during the several times when K.T. answered, defendant called her a "whore" and told her she would regret everything.

¶ 11    The next morning, March 11, 2022, K.T. returned her dog to her apartment and went to work. After work, she asked her parents to meet her at her apartment because she was afraid defendant would be inside. Sometime between then and the events of the previous night, K.T.'s father changed the locks on her apartment door because defendant had a key to the apartment, even though K.T. had never given him one.

¶ 12    K.T. spent the night at a friend's house again, and the two went out to a bar. Defendant called her that night at least another 20 times. When K.T. answered, defendant told her to come pick him up because he was going to kill her parents or burn their house down. He also said that he noticed the locks had been changed in her apartment and that her father was going to pay for it.

¶ 13    K.T. agreed to meet defendant the morning of March 12, 2022, around 2 a.m. because defendant knew where her family lived and she was afraid he would try to harm them. When she

picked him up, he presented as "drugged" and "aggressive." Defendant instructed her to take him to her apartment and, though she did not want to, she complied because she was afraid of what he would do if she said no.

¶ 14    At her apartment, defendant vacillated between being aggressive and hostile, and calm, telling K.T. that he loved her. The two did not go to bed that night, as defendant kept her up all night with his drinking. At some point, K.T. took a shower, and defendant sat in the bathroom while she did so. When she finished showering, defendant became hostile and aggressive again because he had looked through K.T.'s phone.

¶ 15    Defendant called her a "cheating b***," dragged her into the bedroom by her hair, and started swinging his fists at her. She raised her arms in front of her face, and one of his nails scratched her above her left eye. Defendant then took her phone and smashed it, rendering it unable to make or receive calls.

¶ 16    K.T. was able to have a conversation with her mother using the application Snapchat on her phone, and during that conversation she told her mother, in Spanish, that "the dog" was there with her. She testified that "perro" is the Spanish word for dog, and that it was also defendant's nickname. Thus, K.T. explained that she was able to tell her mother that defendant was there without him realizing.

¶ 17    After that conversation, defendant said he did not feel safe. He picked up a knife from the kitchen, grabbed K.T. by the arm, and escorted her outside to her car. K.T. told defendant she did not want to go with him, but she felt like she had no choice. Defendant drove K.T. around until he stopped at a gas station on Pulaski and Addison. When defendant returned to the car, he got a

phone call from a friend. He told the friend that K.T. was with him and that nobody was going to see her again.

¶ 18    Defendant next drove to a restaurant called Lazo's Tacos and went inside while K.T. waited in the car. While she waited, a man came out and K.T. stopped him. She gave him her mother's phone number and asked him to contact her mother and tell her that K.T. was in danger. When defendant returned to the car, he pulled out of the restaurant and saw a vehicle that he believed belonged to K.T.'s parents. Defendant accused K.T. of contacting her parents and struck her in the face with the back of his hand.

¶ 19    Defendant entered the freeway and was driving recklessly, continually hitting K.T. in the face and stabbing the dashboard of her car with the knife. He also struck multiple cars on the freeway and did not stop. Eventually, defendant pulled into the rear of a church, at which point he punched and choked her, pulled her hair, and told her he was going to kill her and he knew where he was going to dump her body. K.T. twice tried to escape, but defendant stopped her by choking her.

¶ 20    Defendant left the church and drove to his mother's apartment, at which point he dragged K.T. inside by the hand. He led her to his bedroom, which he locked with a key, and told K.T. that he was "horny as f***" and wanted to have sex. K.T. refused. Defendant pinned K.T. down on the bed, removed her underwear, and penetrated her vagina with his penis until he ejaculated.

¶ 21    K.T. testified that after sexually assaulting her, "he told me to take a shower because I wasn't going to accuse him of rape." After K.T. showered, defendant wanted her to fall asleep with him, and K.T. was not feeling well "because of all the punching and all the trauma he had caused to [her] head." When K.T. awoke, it was dark outside and defendant asked her how the

police knew where he lived. K.T. responded that she did not know. A short time later, defendant's mother knocked on the door and said that K.T.'s parents were outside. According to K.T., defendant "said I was out being a whore, that I wasn't there," while holding her mouth shut. Later, K.T. could hear police officers outside his room. The officers asked if K.T. was there and instructed defendant to release her. Defendant continued to hold her mouth shut, and then called 911 himself to demand that the officers leave his house. K.T. urged defendant to let her go, and he responded that he loved her and apologized. K.T. told him she never wanted to see him again.

¶ 22 When defendant let K.T. out of the bedroom, she was transported to Community First Medical Center by ambulance where she submitted to a sexual assault kit. She stated that her lips were swollen, and she had scratch marks all over her face. Her nose was dislocated and fractured, and she had a black eye.

¶ 23 After defendant was arrested, he contacted K.T. from the Cook County Department of Corrections. She answered his calls out of fear because he told her he knew people who would come looking for her and because she wanted him to admit what he had done. She eventually stopped taking his calls because she moved and changed her phone number.

¶ 24 As other crimes evidence, K.T. recounted a prior instance on February 14, 2022, where defendant was upset that K.T.'s dog bit his shoe. Defendant took the dog into the bathroom, and K.T. could hear her dog whimpering. The next morning, defendant once again became angry, and K.T. told him to get out of her apartment. In response, defendant punched her in her left eye. K.T. went to a friend's house and returned later that evening. Defendant was still in her apartment and wanted to have sex. K.T. refused, but defendant removed her pants and penetrated her vagina with his penis.

¶ 25 On cross-examination, K.T. admitted that she did not call the police after the February 15, 2022, incident and did not tell anyone that defendant had sexually assaulted her on that date. K.T. also denied having any sexual relations with defendant on the morning of March 12, 2022. However, she admitted that Defendant's Exhibit 2 was a video made by defendant of her performing oral sex on him. She did not know what date that video was made, or even that defendant had recorded her. The State did not object to the admission of the video, but the trial court refused to admit it on the basis that K.T. could not say when it was made.

¶ 26 Abeni Salcedo testified that she was a registered nurse employed in the Community First Medical Center emergency room and that she treated K.T. when she presented to the emergency room on March 12, 2022, claiming that she had been beaten and sexually assaulted. Salcedo recounted events relayed to her by K.T. that corroborated K.T.'s testimony, including her discussion with a stranger at Lazo's Tacos, defendant's violence toward her in the car and in the church parking lot, and what transpired at defendant's apartment. K.T. reported to her that she had head and throat pain as a result of being punched and choked. K.T. also had a hoarse voice as a result of strangulation and some difficulty breathing. Her physical examination of K.T. noted marks on her neck and redness on her face. One of K.T.'s eyes was bloodshot, and she had various bruises and scratches on her face. Her head also exhibited some swelling and she had a wound on her right thumb. Salcedo took multiple swabs from K.T.'s mouth and fingernails, and also obtained combings of her hair and pubic hair.

¶ 27 Dr. Kyle Ackerman testified that he examined K.T. at Community First Medical Center on March 12, 2022. He noted some cervical bleeding as well as some abrasions and redness to her vaginal wall and external abrasions on her vulva, all of which were consistent with sexual assault.

K.T. also had scratches on her left collarbone, right arm, and abdomen, bruises and a laceration on her thumb and right forearm, bruises and redness on her thighs, redness on both knees, and bruises on her right lower leg. Dr. Ackerman also observed redness on her scapula, redness, swelling, and abrasions on her lips, redness on her neck, and bruising and redness on both sides of her face and under her chin.

¶ 28    A CT scan of K.T.'s face revealed a nondisplaced fracture of her nasal bridge. K.T. reported to Dr. Ackerman that she had been struck in the face, and Dr. Ackerman testified that her injury was consistent with her account.

¶ 29    On cross-examination, Dr. Ackerman stated that he could not pinpoint exactly when K.T.'s injuries took place. He also stated he could not determine if K.T.'s abrasions to her vaginal wall resulted from consensual sex, but he did not believe that K.T.'s cervical bleeding would result from consensual sex.

¶ 30    K.T.'s mother, N.S., testified that on March 10, 2022, K.T. called her and asked her and her husband, A.T., K.T.'s father, to accompany K.T. to her apartment. K.T. stated that defendant was there and she was afraid he would hit her. N.S. asked defendant to leave, and he eventually complied. However, he said he would be back, which prompted N.S. to call the police. While in K.T.'s apartment, K.T. received more than 10 phone calls. K.T. answered the phone using the speakerphone, and N.S. recognized the caller's voice as belonging to defendant. K.T. and defendant arranged for him to come retrieve some belongings from K.T.'s car. The following day, A.T. changed the locks on K.T.'s apartment because K.T. feared that defendant would return.

¶ 31    On March 12, 2022, N.S. spoke to K.T. using the Snapchat application on her phone. K.T. informed her mother that her phone was broken and could not make calls. N.S. asked if she was

alone, and K.T. said her dog was crying. N.S. knew that defendant's nickname was "dog," and therefore believed that defendant was in K.T.'s apartment.

¶ 32    N.S. went to K.T.'s apartment with her husband and son, but K.T. was no longer there. She described the apartment as a mess, with drugs and alcohol all over the table. She eventually received a phone call from an unknown man which prompted her to go to Lazo's Tacos. When she pulled into the parking lot, she recognized K.T.'s car. Defendant was in the driver's seat and, as defendant pulled out of the parking lot, he displayed his middle finger to N.S. They tried to follow defendant, but were unsuccessful and instead called 911.

¶ 33    Using a phone that A.T. had previously found in K.T.'s car, which N.S. believed belonged to defendant, she located defendant's address. When she arrived at the address, she called the police again and waited outside the location for approximately an hour. Initially the police could not gain entry to the apartment when they arrived. N.S. did not provide details, but eventually the police entered the apartment and N.S. went inside. Inside she saw a "line of police." When K.T. exited defendant's room, N.S. saw that she was "real beat up. She had so many bruises. Her eye was closed. I saw blood. Seem [*sic*] like she was lost."

¶ 34    The parties stipulated to defendant's phone number, and the State admitted a number of text messages sent to and from K.T.'s phone, as well as a log of incoming and outgoing calls. While the following is not a comprehensive accounting of all the text messages between defendant and K.T., or his endless barrage of phone calls, it does depict defendant's erratic behavior that vacillates between affection and hostility.

¶ 35    On March 10, 2022, at 11:15 p.m., defendant texted K.T., "I love u just don't be mad when your world comes down." At 12:08 a.m. on March 11, 2022, defendant texted K.T., "Could I sleep

over I don't got no where to be I need your help I'm lost." K.T. did not reply. Two minutes later, defendant texted her, "So u can't reply smh." Defendant placed three unanswered calls to K.T. in the next 10 minutes, followed by a text that said, "I miss u so much I don't know tbh I'm in love I can't control my anger JUST DONT DO IT AGAIN ITS ALL I'm asking." After two more unanswered phone calls, defendant and K.T. spoke for a minute and a half at 12:45 a.m. Five minutes later, defendant texted K.T., "I miss u," and "I'm sorry for tweaking I was drunk."

¶ 36    At 1:07 a.m., K.T. texted defendant, "You need to understand that your words and actions hurt me. And the disrespect towards my parents, the threats. That's just not it. You need to get some rest. Good night." Several minutes later, defendant replied, "Wow so u must be texting some one else took 20 minutes to reply I love u girl an tbh les start all over."

¶ 37    Between 10:54 p.m. and 10:56 p.m., on March 11, 2022, defendant placed four unanswered calls to K.T., followed by a text message that said, "R u serious like I just woke up an u can't answer the phone u going to regrets this bye." Defendant then placed another 6 unanswered calls to K.T. in the next 11 minutes before the two spoke for 13 minutes. Approximately an hour later, defendant texted K.T., "U one ugly a*** hoe." Later in the evening, the two made plans to meet up consistent with the testimony at trial.

¶ 38    The State also admitted into evidence a number of videos which we summarize briefly as they corroborate K.T.'s version of events on March 12, 2022. People's Exhibits 12 through 15 were taken from an elevated camera next to a gas station and corroborate the testimony that defendant stopped at a gas station on March 12, 2022. Likewise, People's Exhibits 17 and 18, recorded from a camera in the parking lot of Lazo's Tacos, show defendant entering the parking lot, parking, and exiting the vehicle. After exiting the vehicle, defendant walks to the passenger

side, opens the rear passenger side door, and leans into the vehicle, then slams the door shut and walks away.

¶ 39    People's Exhibits 19 and 20 show a man who approaches K.T.'s vehicle and enters the driver's seat of his own car, which is parked next to K.T.'s vehicle on the passenger side. After the man enters his vehicle, the passenger side door of K.T.'s vehicle opens. A few seconds later, the man exits his vehicle and can be seen standing between the body of his car and the open door. He appears to converse with K.T. for approximately 20 seconds before re-entering his vehicle and driving away.

¶ 40    People's Exhibit 21 is a video that shows defendant returning to his car in the parking lot of Lazo's Tacos, while People's Exhibit 22 shows defendant leaving the same parking lot. People's Exhibits 23 and 24 are videos taken from a camera on McLean Avenue, which show defendant speeding down the street and weaving around other cars, closely followed by K.T.'s parents in their minivan. People's Exhibit 25 shows defendant speeding down Western Avenue, at one point crossing into the opposing lane. Lastly, People's Exhibit 26 is a video that shows defendant exiting the freeway before failing to stop at a stop sign and making an erratic left turn from the right-hand lane of the offramp, cutting off a car in the left lane in the process.

¶ 41    Additionally, multiple recordings from Chicago police body worn cameras were admitted. They show police entering defendant's mother's apartment with his mother's permission and knocking on defendant's bedroom door. Defendant denies that anyone is there with him and repeatedly demands that the police leave because they have no right to be there and that they are invading his privacy. At one point during the standoff where defendant denies that K.T. is with him, one of the officers asks why her parents are there. Defendant replies, "Because I got into it

with this dumb b***." When officers inform K.T. that her parents are concerned about her, defendant shouts back, "I don't understand why they're so concerned." When defendant finally releases K.T. from his room, one of the officers asks her if she needs an ambulance and she responds in the affirmative. After defendant leaves his room, he sits in his kitchen speaking to the police. He insists during the course of the conversation that he is not a danger to anyone and that he did not hit K.T.

¶ 42    Finally, the State introduced a number of pieces of recorded phone calls from the Cook County Department of Corrections. In one, K.T. says defendant is "f*** crazy" and she asks him why she should put herself in harm's way knowing that about him. Defendant responds that she did put herself in harm's way by talking to other men. In another, K.T. confronted defendant about damage he did to her car. Defendant admits to stabbing her radio, but denies doing anything else. K.T. tells him that he dented her dashboard by kicking it, and that he hit other cars on the highway. Defendant then says that he remembers and begins laughing.

¶ 43    In a call with his sister, his sister informs him that K.T. is claiming defendant raped her. Defendant jokingly asks if he should tell the judge that K.T. raped him. Defendant then says that K.T. is lying and she was playing hard to get. He then questions why K.T. would let "three to four months go" over "a little a*** whooping" because "you're a*** couldn't keep your f*** fingers to yourself."

¶ 44                                B. Defendant's Case-in-Chief

¶ 45    In defendant's case-in-chief, Louis Godoy testified that he shared a bedroom with defendant in March 2022. On March 12, 2022, Godoy arrived home between 1 and 2 a.m. After going to bed, he was awakened by defendant hitting the window. Defendant then asked him to

open the door. Godoy let defendant in, who appeared to be drunk. Defendant looked through some of his clothes, changed, and then left. Godoy was able to see K.T. outside in the car.

¶ 46    Danelo Vazquez testified that he lived in the same apartment as defendant and defendant's mother. On March 12, 2022, he left for work at 3:30 p.m. Before he left, he saw defendant and K.T. sitting at the kitchen table talking. He did not see anyone holding a knife, and he did not see any injuries on K.T.

¶ 47    Maria Guevara testified that she, too, lived in the apartment with defendant, defendant's mother, Vazquez, and Godoy. On March 12, 2022, Guevara was in the kitchen between 3 p.m. and 3:30 p.m. when defendant and K.T. arrived. The three ate in the kitchen and then Guevara went to her room. Later that night, the police arrived. Guevara stated she was on the porch when the police arrived, and she did not leave the porch while she was there. She did not hear any fighting or yelling while defendant and K.T. were in the apartment.

¶ 48    Defendant testified in his own defense. He was 25 years old at the time of trial, and acknowledged that he had two convictions for possession of a stolen motor vehicle, one conviction for attempted possession of a stolen motor vehicle, and one conviction for felony theft. As of March 12, 2022, defendant was on parole for his theft conviction.

¶ 49    According to defendant, he received a call from K.T. around midnight on March 12, 2022, and she picked him up from a friend's house. The two drove to a liquor store and then went to defendant's apartment so defendant could change his clothes. The two then drove to Lake Shore Drive where they "hung out" for a few hours. They then went to K.T.'s apartment where they drank and had sex. Defendant testified that Defendant's Exhibit 2 was a video he made of K.T. performing oral sex on him around 5 or 6 a.m. that morning.

¶ 50    Defendant went through K.T.'s phone and discovered messages with another man, which angered him so he hit her in the face twice. He then left the apartment and went to K.T.'s car. She followed, and defendant tried to end the relationship. However, K.T. refused to leave him, so the two drove to a restaurant to get food. Defendant went inside while K.T. remained in the car.

¶ 51    Defendant denied threatening her with a knife or demanding that she remain in the car. He also denied threatening K.T.'s parents. The two returned to defendant's apartment where he saw two of his neighbors and they all ate breakfast together. After eating, defendant and K.T. went to sleep. When police arrived and knocked on his bedroom door, they asked if K.T. was there. Defendant denied holding K.T. against her will.

¶ 52    Defendant denied telling K.T. that her father was going to regret changing her locks and denied threatening K.T.'s father. During the State's cross-examination, it accused him of getting into K.T.'s car with her and a knife. Defendant claimed that he tried to leave on his own and K.T. followed him. He also denied threatening K.T. with a knife, claiming, "First of all, you said I had a knife. I never had a knife." However, he reversed course only a few questions later, admitting to hitting multiple cars on the freeway, and admitting to stabbing the dashboard of the car with a knife. However, he denied hitting K.T. while driving, claiming, "I can't do that, I'm driving."

¶ 53    Additionally, defendant denied calling K.T. repeatedly before she picked him up around midnight on March 12, 2022, and denied threatening her or her family during the phone call. He insisted, "I would never say something like that."

¶ 54    After defendant's testimony, defense counsel sought to admit Defendant's Exhibit 2 into evidence. The trial court refused to admit the video, citing the "eavesdropping statute" and the fact that the trial court had "heard nothing about her consent" to the recording of the video. The trial

court also stated that "it is absolutely irrelevant whether they had consensual oral sex or not." Though not admitted into evidence, this video is contained in the record. It is approximately one minute long and depicts K.T. performing oral sex on defendant. K.T. does not speak during the video.

¶ 55                    C. The Trial Court's Ruling

¶ 56    On July 26, 2023, the trial court delivered its ruling, during which it recited the evidence presented at trial at tremendous length. The trial court found K.T.'s testimony to be credible, noting:

> "Her testimony was corroborated by video footage from a gas station, Lazo's Taco's, POD cameras, red light cameras, and body worn cameras, as well as photographs, jailhouse calls, DNA results, and testimony from medical personnel and her mother."

¶ 57    In contrast, the trial court found defendant's witnesses incredible:

> "The testimony of Mr. Godoy doesn't bear any relevance as to what happened once the defendant left his home in early morning hours of March 12th. Both Mr. Vazquez and Ms. Guevara denied seeing any injuries to the complaining witness. However, the defendant himself admitted to hitting her twice in the face before arriving at his house in the afternoon.
>
> In addition, Ms. Guevara testified that she was on the porch and remained on the porch when the police arrived to the house that evening. However, her testimony is directly contradicted by body worn camera footage."

¶ 58    Regarding defendant's credibility, the trial court said the following:

> "Admit what you can't deny, and deny what you can't admit. On the stand, he admits to hitting the complaining witness, to stabbing and kicking her dashboard, even though he claimed to never have a knife. On the stand, he admitted to hitting other cars while driving, and in fact on the jail calls he laughs about it. He completely minimizes his interactions with the police despite the body worn camera depicting a one hour standoff with the defendant while he repeatedly denies that the complaining witness was in his room. He is arrogant and belligerent throughout the interaction.
>
> Video footage shows him driving recklessly through the streets of Chicago. The 911 call depicts him as entitled and offended that the police would dare to enter his home looking for [K.T.].
>
> He lied to his mother, he lied to his sister, he lied to the police, and the Court finds him to be incredible from the stand as well."

¶ 59    The trial court found defendant guilty of aggravated criminal sexual assault, aggravated kidnapping, and aggravated domestic battery. Subsequently, the trial court sentenced defendant to 5 years in prison for aggravated domestic battery, concurrent with a 10-year sentence for aggravated kidnapping. It sentenced defendant to 8 years in prison for aggravated criminal sexual assault, consecutive to his sentence for aggravated kidnapping.

¶ 60    This appeal followed.

¶ 61                                    II. ANALYSIS

¶ 62    Defendant now appeals his conviction with a singular claim that the trial court erred in excluding Defense Exhibit 2. Specifically, defendant claims that the trial court erroneously applied the eavesdropping statute to the video, and incorrectly concluded that the video was irrelevant.

¶ 63    The State, in response, argues that defendant has forfeited any argument related to the admissibility or inadmissibility of the video based on the eavesdropping statute because he failed to make an adequate offer of proof. However, as the State correctly notes, we need not reach the question of whether the eavesdropping statute applies because we may affirm on any basis in the record. *People v. Wilson*, 2014 IL App (1st) 113570, ¶ 41. Accordingly, the State argues that the excluded video was irrelevant and would not have changed the outcome of the trial. We agree that even if the video had been admitted, it would not have had any tangible bearing on the outcome of the trial, and thus we may confine our analysis to the video's relevance and impact on the outcome of the trial.

¶ 64    Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). In the context of trials for criminal sexual assault or abuse, evidence of prior sexual activity of the victim with the accused is admissible when offered by the accused to show that the victim consented to the sexual conduct that is the subject of alleged offense. 725 ILCS 5/115-7(a) (West 2022).

¶ 65    This court reviews the trial court's decision to admit or exclude evidence based on relevance or lack thereof for an abuse of discretion. *People v. Robinson*, 217 Ill. 2d 43, 62 (2005). An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable

- 17 -

such that no reasonable person would take the view adopted by the trial court. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003).

¶ 66    Even if a trial court errs in admitting or excluding evidence, that error is subject to a harmless error analysis, meaning the State must show that the verdict would have been the same absent the error. *People v. McBride*, 2020 IL App (2d) 170873, ¶ 33. For an evidentiary error that does not contain a constitutional dimension, the State must show that there is no reasonable probability that the verdict would have been different absent the alleged error. *In re E.H.*, 224 Ill. 2d 172, 180 (2006). Our task is thus to examine the record and determine whether defendant's proposed video exhibit could have reasonably affected the verdict. *People v. Hoddenbach*, 116 Ill. App. 3d 57, 60 (1983).

¶ 67    Defendant insists that the video serves two evidentiary purposes, First, he claims that the video "demonstrates that defendant and K.T. engaged in consensual oral sex before the domestic abuse occurred." According to defendant, this "bolsters defendant's testimony that they had consensual vaginal sex shortly thereafter." He also claims that this impeaches K.T.'s testimony that she did not engage in sexual relations with defendant on the morning of March 12, 2022. According to defendant, he and K.T. engaged in sexual intercourse on the morning of March 12, 2022, before any of the physical violence. Given that K.T. testified to only having intercourse with defendant once that day, defendant insists that this video is evidence of the consensual nature of the sex and that he did not sexually assault K.T.

¶ 68    We can begin with our analysis of whether the video has any relevance whatsoever. As noted previously, evidence of prior sexual conduct between an accused and the victim is admissible to show that the conduct that forms the basis of the charge against the defendant was consensual.

725 ILCS 5/115-7(a) (West 2022). However, the rape-shield statute also concerns itself with avoiding the unnecessary harassment and humiliation of the complaining witness. *People v. Summers*, 353 Ill. App. 3d 367, 374 (2004). Thus, minimally relevant evidence of prior sexual activity should not be admitted. *Id*. "The 'constitutionally required' exception to the rape-shield statute 'should be construed narrowly, but also fairly.' " *Id*. (quoting *People v. Santos*, 211 Ill. 2d 395, 416-17 (2004)). Defendant and K.T. were in a relationship. The notion that they had, on prior occasions, engaged in consensual sexual activity is not surprising, and hardly probative of whether K.T.'s sexually assault allegations were credible. She admitted that the video was a recording of her performing oral sex, though she did not know on what date, and defendant's testimony maintained that the two engaged in consensual relations on morning of March 12, 2022. The video itself, which has no time stamps to corroborate when it took place, offered nothing more than unnecessary humiliation of K.T. The admission of the video offered nothing that testimony alone could not provide. On that basis, the trial court's decision to exclude the video was not an abuse of discretion.

¶ 69    However, even if we assume that the video has some relevance to this case and that the trial court erred in excluding it, that is the extent to which we can agree with defendant's argument. For the video to have any of the other significance defendant attributes to it requires that we assume the video is what he says it is: a video recorded the morning of March 12, 2022.

¶ 70    There is only one way the video would be impeaching of K.T.'s testimony or support the claim that K.T. and defendant had consensual sex on the morning of March 12, 2022. That is if the trial court accepted defendant's otherwise unverifiable claim that the video was filmed on the morning of March 12, 2022, and that the only time he and K.T. had sexual intercourse that day

was prior to the physical violence defendant inflicted on her. Given the myriad lies defendant told throughout this case, as identified by the trial court, it is highly doubtful, bordering on impossible, that the trial court would have credited defendant's testimony in this regard.

¶ 71 Defendant lied to those gathered in the home, including police, when he claimed he was alone and that K.T. was not with him. When that pretense could not be continued indefinitely, he released her. When questioned about what happened, he lied to police by claiming he did not hit her. Given K.T.'s injuries and defendant's own admissions in his recorded jail calls he was proven to be a liar. Even then, however, defendant spoke nonchalantly and unrepentantly about his actions, telling K.T. she put herself in harm's way and suggesting that K.T. deserved what he did. Defendant also testified from the stand that he never had a knife, before ultimately admitting to stabbing K.T.'s dashboard with a knife, even though he had admitted to K.T. during a recorded jail phone call that he stabbed her car's radio. Defendant denied calling K.T. in the early morning hours of March 12, 2022, even a "couple of times," which is belied by the call records entered into evidence.

¶ 72 Defendant identifies a number of aspects of K.T.'s testimony that he considers "inconsistent and/or implausible" and therefore argues the evidence was closely balanced and the admission of Defendant's Exhibit 2 would have affected the verdict, despite the numerous issues with his own credibility. At the outset, we note that minor inconsistencies in the State's case are not incompatible with proof beyond a reasonable doubt. *People v. Jones*, 246 Ill. App. 3d 339, 347 (1993). Even if K.T.'s testimony contained some minor inconsistencies, the trial court clearly found her credible overall.

¶ 73    First, defendant challenges K.T.'s description of what her face looked like after the events of February 15, 2022, when compared to a photo she took. The photo itself is grainy, and the area around the eye in question appears to be a bruised purple-red color, while K.T. described her eye as "purple and drooping." Either way, the picture appears to depict K.T. with a bruised eye, and quibbling over precisely how she described the injury compared to one angle of a poor photograph is hardly a reason to question K.T.'s testimony about the alleged offenses such that the admission of Defendant's Exhibit 2 would have possibly changed the outcome.

¶ 74    Next, defendant questions why K.T. never called the police after the February 15, 2022, incident, but she was willing to do so for the events surrounding the charged offenses. This, defendant claims, casts doubt on her credibility. But defendant supplies the answer to his own question in his brief: many victims of domestic violence simply do not report it. But more importantly, defendant's conduct in this case was not only physical abuse and sexual assault. It also entailed kidnapping, threats to harm K.T.'s family, and threats that he was going to kill K.T. A possible and consistent explanation is that K.T.'s decision was the logical conclusion of defendant's escalating behavior, as opposed to it being a reason to discredit her.

¶ 75    Defendant also challenges K.T.'s testimony that defendant could and would break into her apartment given that she also testified that defendant had a key. While these two facts are at odds, they have virtually nothing to do with the offenses at issue, and it does not detract from the majority of K.T.'s testimony that was consistent and corroborated by other witnesses and exhibits.

¶ 76    Defendant next takes issue with the fact that K.T. met defendant at all on the morning of March 12, 2022, despite defendant's prior violence and threats, claiming that K.T.'s actions on March 12, 2022, were incongruent with her testimony about defendant's prior actions. However,

the explanation is simple and supplied by K.T.'s testimony. She testified that she met defendant because he had threatened her parents, knew where her parents lived, and she was afraid he might try to harm them.

¶ 77    The next point of K.T.'s testimony that he argues detracts from her own credibility is related to the knife. Defendant claims that K.T. did not tell Salcedo about defendant having a kitchen knife. Instead, she told Salcedo that she thought defendant stabbed her thumb with a pocket knife. We fail to see the significance of whether defendant had a kitchen knife or a pocket knife. Either way it was a dangerous weapon and the fact that defendant was armed with a knife is not in dispute—defendant admitted to having the knife.

¶ 78    Finally, defendant argues that K.T.'s recorded phone calls with defendant were suspiciously devoid of any references to him sexually assaulting her. Once again, K.T.'s own testimony provides a logical explanation. Her stated goal in talking to him was to keep him calm and get him to admit what he had done. She also stated she took his calls in the first place because she was afraid, as defendant told her he knew people who would come looking for her.

¶ 79    Ultimately, the trial court did not deem these areas of testimony sufficient to discredit K.T.'s overall testimony. We cannot imagine how the admission of Defendant's Exhibit 2 would change that calculus. In order to accept defendant's argument that this video could have altered how the trial court viewed defendant's version of events, we would first have to decide: which version of events should the trial court have believed? The one where defendant claimed K.T. was not being held hostage in his room? Or the one where he denied physically abusing her only to later admit to the abuse but nevertheless blame his actions on K.T.? Perhaps the trial court should have credited defendant's short-lived version where he was never armed with a knife. Or it should

have accepted defendant's insistence that he did not make threats about K.T.'s family because he "would never do that," even though he had no compunction about physically abusing K.T., subjecting her to a harrowing and reckless freeway ride in which he collided with multiple vehicles, or sending her multiple threatening text messages.

¶ 80    The reality is the trial court found defendant incredible because he repeatedly lied throughout his testimony, not because the trial court did not consider defendant's proposed exhibit. It defies belief that, if the trial court already found K.T. credible and defendant incredible, the admission of Defendant's Exhibit 2 would have impacted the outcome of this case in any way.

¶ 81    Defendant's testimony was incredible because his description of the core, essential facts of this case shifted whenever and however necessary to try and hide what he had done. Meanwhile, K.T.'s testimony, despite any minor inconsistencies and oddities identified by defendant, was consistent as to the core allegations against defendant. Moreover, her testimony was corroborated by her statements to Salcedo, Dr. Ackerman's physical examination and his opinion that K.T.'s bleeding in her cervix would not be caused by consensual sex, the text messages and call logs, video evidence of defendant driving K.T.'s car, and the recorded jail phone calls.

¶ 82    There was not a reasonable probability that Defendant's Exhibit 2 would have completely swung the trial court's credibility determinations in the face of the overwhelming and compelling evidence of defendant's guilt. Even if the video had the tiniest shred of relevance, its exclusion was entirely harmless.

¶ 83    Accordingly, we affirm the trial court's judgment.

¶ 84                                III. CONCLUSION

¶ 85    For the foregoing reasons, we affirm the trial court's judgment.

¶ 86    Affirmed.